(Slip Opinion) OCTOBER TERM, 2006 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LEEGIN CREATIVE LEATHER PRODUCTS, INC. *v.* PSKS, INC., DBA KAY'S KLOSET . . . KAY'S SHOES

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 06–480. Argued March 26, 2007—Decided June 28, 2007

Given its policy of refusing to sell to retailers that discount its goods below suggested prices, petitioner (Leegin) stopped selling to respondent's (PSKS) store. PSKS filed suit, alleging, *inter alia,* that Leegin violated the antitrust laws by entering into vertical agreements with its retailers to set minimum resale prices. The District Court excluded expert testimony about Leegin's pricing policy's procompetitive effects on the ground that *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S. 373, makes it *per se* illegal under §1 of the Sherman Act for a manufacturer and its distributor to agree on the minimum price the distributor can charge for the manufacturer's goods. At trial, PSKS alleged that Leegin and its retailers had agreed to fix prices, but Leegin argued that its pricing policy was lawful under §1. The jury found for PSKS. On appeal, the Fifth Circuit declined to apply the rule of reason to Leegin's vertical price-fixing agreements and affirmed, finding that *Dr. Miles'* *per se* rule rendered irrelevant any procompetitive justifications for Leegin's policy.

*Held: Dr. Miles* is overruled and vertical price restraints are to be judged by the rule of reason. Pp. 5–28.

  (a) The accepted standard for testing whether a practice restrains trade in violation of §1 is the rule of reason, which requires the factfinder to weigh "all of the circumstances," *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 49, including "specific information about the relevant business" and "the restraint's history, nature, and effect," *State Oil Co. v. Khan,* 522 U. S. 3, 10. The rule distinguishes between restraints with anticompetitive effect that are harmful to the consumer and those with procompetitive effect that are in the consumer's best interest. However, when a restraint is deemed

Syllabus

"unlawful *per se*," *ibid.,* the need to study an individual restraint's reasonableness in light of real market forces is eliminated, *Business Electronics Corp.* v. *Sharp Electronics Corp.*, 485 U. S. 717, 723. Resort to *per se* rules is confined to restraints "that would always or almost always tend to restrict competition and decrease output." *Ibid.* Thus, a *per se* rule is appropriate only after courts have had considerable experience with the type of restraint at issue, see *Broadcast Music, Inc.* v. *Columbia Broadcasting System, Inc.*, 441 U. S. 1, 9, and only if they can predict with confidence that the restraint would be invalidated in all or almost all instances under the rule of reason, see *Arizona* v. *Maricopa County Medical Soc.*, 457 U. S. 332, 344. Pp. 5–7.

(b) Because the reasons upon which *Dr. Miles* relied do not justify a *per se* rule, it is necessary to examine, in the first instance, the economic effects of vertical agreements to fix minimum resale prices and to determine whether the *per se* rule is nonetheless appropriate. Were this Court considering the issue as an original matter, the rule of reason, not a *per se* rule of unlawfulness, would be the appropriate standard to judge vertical price restraints. Pp. 7–19.

(1) Economics literature is replete with procompetitive justifications for a manufacturer's use of resale price maintenance, and the few recent studies on the subject also cast doubt on the conclusion that the practice meets the criteria for a *per se* rule. The justifications for vertical price restraints are similar to those for other vertical restraints. Minimum resale price maintenance can stimulate interbrand competition among manufacturers selling different brands of the same type of product by reducing intrabrand competition among retailers selling the same brand. This is important because the antitrust laws' "primary purpose . . . is to protect interbrand competition," *Khan, supra*, at 15. A single manufacturer's use of vertical price restraints tends to eliminate intrabrand price competition; this in turn encourages retailers to invest in services or promotional efforts that aid the manufacturer's position as against rival manufacturers. Resale price maintenance may also give consumers more options to choose among low-price, low-service brands; high-price, high-service brands; and brands falling in between. Absent vertical price restraints, retail services that enhance interbrand competition might be underprovided because discounting retailers can free ride on retailers who furnish services and then capture some of the demand those services generate. Retail price maintenance can also increase interbrand competition by facilitating market entry for new firms and brands and by encouraging retailer services that would not be provided even absent free riding. Pp. 9–12.

(2) Setting minimum resale prices may also have anticompetitive

effects; and unlawful price fixing, designed solely to obtain monopoly profits, is an ever present temptation. Resale price maintenance may, for example, facilitate a manufacturer cartel or be used to organize retail cartels. It can also be abused by a powerful manufacturer or retailer. Thus, the potential anticompetitive consequences of vertical price restraints must not be ignored or underestimated. Pp. 12–14.

(3) Notwithstanding the risks of unlawful conduct, it cannot be stated with any degree of confidence that retail price maintenance "always or almost always tend[s] to restrict competition and decrease output," *Business Electronics, supra,* at 723. Vertical retail-price agreements have either procompetitive or anticompetitive effects, depending on the circumstances in which they were formed; and the limited empirical evidence available does not suggest efficient uses of the agreements are infrequent or hypothetical. A *per se* rule should not be adopted for administrative convenience alone. Such rules can be counterproductive, increasing the antitrust system's total cost by prohibiting procompetitive conduct the antitrust laws should encourage. And a *per se* rule cannot be justified by the possibility of higher prices absent a further showing of anticompetitive conduct. The antitrust laws primarily are designed to protect interbrand competition from which lower prices can later result. Respondent's argument overlooks that, in general, the interests of manufacturers and consumers are aligned with respect to retailer profit margins. Resale price maintenance has economic dangers. If the rule of reason were to apply, courts would have to be diligent in eliminating their anticompetitive uses from the market. Factors relevant to the inquiry are the number of manufacturers using the practice, the restraint's source, and a manufacturer's market power. The rule of reason is designed and used to ascertain whether transactions are anticompetitive or procompetitive. This standard principle applies to vertical price restraints. As courts gain experience with these restraints by applying the rule of reason over the course of decisions, they can establish the litigation structure to ensure the rule operates to eliminate anticompetitive restraints from the market and to provide more guidance to businesses. Pp. 14–19.

(c) *Stare decisis* does not compel continued adherence to the *per se* rule here. Because the Sherman Act is treated as a common-law statute, its prohibition on "restraint[s] of trade" evolves to meet the dynamics of present economic conditions. The rule of reason's case-by-case adjudication implements this common-law approach. Here, respected economics authorities suggest that the *per se* rule is inappropriate. And both the Department of Justice and the Federal Trade Commission recommend replacing the *per se* rule with the rule

of reason. In addition, this Court has "overruled [its] precedents
when subsequent cases have undermined their doctrinal underpin-
nings." *Dickerson* v. *United States*, 530 U. S. 428, 443. It is not sur-
prising that the Court has distanced itself from *Dr. Miles'* rationales,
for the case was decided not long after the Sherman Act was enacted,
when the Court had little experience with antitrust analysis. Only
eight years after *Dr. Miles*, the Court reined in the decision, holding
that a manufacturer can suggest resale prices and refuse to deal with
distributors who do not follow them, *United States v. Colgate & Co.,*
250 U. S. 300, 307–308; and more recently the Court has tempered,
limited, or overruled once strict vertical restraint prohibitions, see,
*e.g., GTE Sylvania*, *supra,* at 57–59. The *Dr. Miles* rule is also incon-
sistent with a principled framework, for it makes little economic
sense when analyzed with the Court's other vertical restraint cases.
Deciding that procompetitive effects of resale price maintenance are
insufficient to overrule *Dr. Miles* would call into question cases such
as *Colgate* and *GTE Sylvania.* Respondent's arguments for reaffirm-
ing *Dr. Miles* based on *stare decisis* do not require a different result.
Pp. 19–28.

171 Fed. Appx. 464, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS,
C. J., and SCALIA, THOMAS, and ALITO, JJ., joined. BREYER, J., filed a
dissenting opinion, in which STEVENS, SOUTER, and GINSBURG, JJ.,
joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

---

No. 06–480

---

## LEEGIN CREATIVE LEATHER PRODUCTS, INC., PETITIONER *v.* PSKS, INC., DBA KAY'S KLOSET . . . KAY'S SHOES

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[June 28, 2007]

JUSTICE KENNEDY delivered the opinion of the Court.

In *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S. 373 (1911), the Court established the rule that it is *per se* illegal under §1 of the Sherman Act, 15 U. S. C. §1, for a manufacturer to agree with its distributor to set the minimum price the distributor can charge for the manufacturer's goods. The question presented by the instant case is whether the Court should overrule the *per se* rule and allow resale price maintenance agreements to be judged by the rule of reason, the usual standard applied to determine if there is a violation of §1. The Court has abandoned the rule of *per se* illegality for other vertical restraints a manufacturer imposes on its distributors. Respected economic analysts, furthermore, conclude that vertical price restraints can have procompetitive effects. We now hold that *Dr. Miles* should be overruled and that vertical price restraints are to be judged by the rule of reason.

I

Petitioner, Leegin Creative Leather Products, Inc.

(Leegin), designs, manufactures, and distributes leather goods and accessories. In 1991, Leegin began to sell belts under the brand name "Brighton." The Brighton brand has now expanded into a variety of women's fashion accessories. It is sold across the United States in over 5,000 retail establishments, for the most part independent, small boutiques and specialty stores. Leegin's president, Jerry Kohl, also has an interest in about 70 stores that sell Brighton products. Leegin asserts that, at least for its products, small retailers treat customers better, provide customers more services, and make their shopping experience more satisfactory than do larger, often impersonal retailers. Kohl explained: "[W]e want the consumers to get a different experience than they get in Sam's Club or in Wal-Mart. And you can't get that kind of experience or support or customer service from a store like Wal-Mart." 5 Record 127.

Respondent, PSKS, Inc. (PSKS), operates Kay's Kloset, a women's apparel store in Lewisville, Texas. Kay's Kloset buys from about 75 different manufacturers and at one time sold the Brighton brand. It first started purchasing Brighton goods from Leegin in 1995. Once it began selling the brand, the store promoted Brighton. For example, it ran Brighton advertisements and had Brighton days in the store. Kay's Kloset became the destination retailer in the area to buy Brighton products. Brighton was the store's most important brand and once accounted for 40 to 50 percent of its profits.

In 1997, Leegin instituted the "Brighton Retail Pricing and Promotion Policy." 4 *id.,* at 939. Following the policy, Leegin refused to sell to retailers that discounted Brighton goods below suggested prices. The policy contained an exception for products not selling well that the retailer did not plan on reordering. In the letter to retailers establishing the policy, Leegin stated:

"In this age of mega stores like Macy's, Bloomingdales, May Co. and others, consumers are perplexed by promises of product quality and support of product which we believe is lacking in these large stores. Consumers are further confused by the ever popular sale, sale, sale, etc.

"We, at Leegin, choose to break away from the pack by selling [at] specialty stores; specialty stores that can offer the customer great quality merchandise, superb service, and support the Brighton product 365 days a year on a consistent basis.

"We realize that half the equation is Leegin producing great Brighton product and the other half is you, our retailer, creating great looking stores selling our products in a quality manner." *Ibid.*

Leegin adopted the policy to give its retailers sufficient margins to provide customers the service central to its distribution strategy. It also expressed concern that discounting harmed Brighton's brand image and reputation.

A year after instituting the pricing policy Leegin introduced a marketing strategy known as the "Heart Store Program." See *id.,* at 962–972. It offered retailers incentives to become Heart Stores, and, in exchange, retailers pledged, among other things, to sell at Leegin's suggested prices. Kay's Kloset became a Heart Store soon after Leegin created the program. After a Leegin employee visited the store and found it unattractive, the parties appear to have agreed that Kay's Kloset would not be a Heart Store beyond 1998. Despite losing this status, Kay's Kloset continued to increase its Brighton sales.

In December 2002, Leegin discovered Kay's Kloset had been marking down Brighton's entire line by 20 percent. Kay's Kloset contended it placed Brighton products on sale to compete with nearby retailers who also were undercutting Leegin's suggested prices. Leegin, nonetheless, re-

quested that Kay's Kloset cease discounting. Its request refused, Leegin stopped selling to the store. The loss of the Brighton brand had a considerable negative impact on the store's revenue from sales.

PSKS sued Leegin in the United States District Court for the Eastern District of Texas. It alleged, among other claims, that Leegin had violated the antitrust laws by "enter[ing] into agreements with retailers to charge only those prices fixed by Leegin." *Id.,* at 1236. Leegin planned to introduce expert testimony describing the procompetitive effects of its pricing policy. The District Court excluded the testimony, relying on the *per se* rule established by *Dr. Miles*. At trial PSKS argued that the Heart Store program, among other things, demonstrated Leegin and its retailers had agreed to fix prices. Leegin responded that it had established a unilateral pricing policy lawful under §1, which applies only to concerted action. See *United States* v. *Colgate & Co.*, 250 U. S. 300, 307 (1919). The jury agreed with PSKS and awarded it $1.2 million. Pursuant to 15 U. S. C. §15(a), the District Court trebled the damages and reimbursed PSKS for its attorney's fees and costs. It entered judgment against Leegin in the amount of $3,975,000.80.

The Court of Appeals for the Fifth Circuit affirmed. 171 Fed. Appx. 464 (2006) *(per curiam)*. On appeal Leegin did not dispute that it had entered into vertical price-fixing agreements with its retailers. Rather, it contended that the rule of reason should have applied to those agreements. The Court of Appeals rejected this argument. *Id.,* at 466–467. It was correct to explain that it remained bound by *Dr. Miles* "[b]ecause [the Supreme] Court has consistently applied the *per se* rule to [vertical minimum price-fixing] agreements." 171 Fed. Appx., at 466. On this premise the Court of Appeals held that the District Court did not abuse its discretion in excluding the testimony of Leegin's economic expert, for the *per se* rule rendered

irrelevant any procompetitive justifications for Leegin's pricing policy. *Id.,* at 467. We granted certiorari to determine whether vertical minimum resale price maintenance agreements should continue to be treated as *per se* unlawful. 549 U. S. ___ (2006).

## II

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." Ch. 647, 26 Stat. 209, as amended, 15 U. S. C. §1. While §1 could be interpreted to proscribe all contracts, see, *e.g., Board of Trade of Chicago* v. *United States*, 246 U. S. 231, 238 (1918), the Court has never "taken a literal approach to [its] language," *Texaco Inc.* v. *Dagher*, 547 U. S. 1, 5 (2006). Rather, the Court has repeated time and again that §1 "outlaw[s] only unreasonable restraints." *State Oil Co.* v. *Khan*, 522 U. S. 3, 10 (1997).

The rule of reason is the accepted standard for testing whether a practice restrains trade in violation of §1. See *Texaco, supra,* at 5. "Under this rule, the factfinder weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition." *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433 U. S. 36, 49 (1977). Appropriate factors to take into account include "specific information about the relevant business" and "the restraint's history, nature, and effect." *Khan, supra,* at 10. Whether the businesses involved have market power is a further, significant consideration. See, *e.g., Copperweld Corp.* v. *Independence Tube Corp.*, 467 U. S. 752, 768 (1984) (equating the rule of reason with "an inquiry into market power and market structure designed to assess [a restraint's] actual effect"); see also *Illinois Tool Works Inc.* v. *Independent Ink, Inc.*, 547 U. S. 28, 45–46 (2006). In its design and function the rule distinguishes between re-

straints with anticompetitive effect that are harmful to
the consumer and restraints stimulating competition that
are in the consumer's best interest.

The rule of reason does not govern all restraints. Some
types "are deemed unlawful *per se.*" *Khan, supra,* at 10.
The *per se* rule, treating categories of restraints as neces-
sarily illegal, eliminates the need to study the reasonable-
ness of an individual restraint in light of the real market
forces at work, *Business Electronics Corp.* v. *Sharp Elec-
tronics Corp.*, 485 U. S. 717, 723 (1988); and, it must be
acknowledged, the *per se* rule can give clear guidance for
certain conduct. Restraints that are *per se* unlawful in-
clude horizontal agreements among competitors to fix
prices, see *Texaco*, *supra,* at 5, or to divide markets, see
*Palmer* v. *BRG of Ga., Inc.*, 498 U. S. 46, 49–50 (1990) *(per
curiam).*

Resort to *per se* rules is confined to restraints, like those
mentioned, "that would always or almost always tend to
restrict competition and decrease output." *Business Elec-
tronics*, *supra,* at 723 (internal quotation marks omitted).
To justify a *per se* prohibition a restraint must have
"manifestly anticompetitive" effects, *GTE Sylvania*, *supra,*
at 50, and "lack . . . any redeeming virtue," *Northwest
Wholesale Stationers, Inc.* v. *Pacific Stationery & Printing
Co.*, 472 U. S. 284, 289 (1985) (internal quotation marks
omitted).

As a consequence, the *per se* rule is appropriate only
after courts have had considerable experience with the
type of restraint at issue, see *Broadcast Music, Inc.* v.
*Columbia Broadcasting System, Inc.*, 441 U. S. 1, 9 (1979),
and only if courts can predict with confidence that it would
be invalidated in all or almost all instances under the rule
of reason, see *Arizona* v. *Maricopa County Medical Soc.*,
457 U. S. 332, 344 (1982). It should come as no surprise,
then, that "we have expressed reluctance to adopt *per se*
rules with regard to restraints imposed in the context of

business relationships where the economic impact of certain practices is not immediately obvious." *Khan, supra,* at 10 (internal quotation marks omitted); see also *White Motor Co.* v. *United States*, 372 U. S. 253, 263 (1963) (refusing to adopt a *per se* rule for a vertical nonprice restraint because of the uncertainty concerning whether this type of restraint satisfied the demanding standards necessary to apply a *per se* rule). And, as we have stated, a "departure from the rule-of-reason standard must be based upon demonstrable economic effect rather than . . . upon formalistic line drawing." *GTE Sylvania, supra,* at 58–59.

## III

The Court has interpreted *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S. 373 (1911), as establishing a *per se* rule against a vertical agreement between a manufacturer and its distributor to set minimum resale prices. See, *e.g., Monsanto Co.* v. *Spray-Rite Service Corp.*, 465 U. S. 752, 761 (1984). In *Dr. Miles* the plaintiff, a manufacturer of medicines, sold its products only to distributors who agreed to resell them at set prices. The Court found the manufacturer's control of resale prices to be unlawful. It relied on the common-law rule that "a general restraint upon alienation is ordinarily invalid." 220 U. S., at 404–405. The Court then explained that the agreements would advantage the distributors, not the manufacturer, and were analogous to a combination among competing distributors, which the law treated as void. *Id.,* at 407–408.

The reasoning of the Court's more recent jurisprudence has rejected the rationales on which *Dr. Miles* was based. By relying on the common-law rule against restraints on alienation, *id.,* at 404–405, the Court justified its decision based on "formalistic" legal doctrine rather than "demonstrable economic effect," *GTE Sylvania, supra,* at 58–59. The Court in *Dr. Miles* relied on a treatise published in

1628, but failed to discuss in detail the business reasons that would motivate a manufacturer situated in 1911 to make use of vertical price restraints. Yet the Sherman Act's use of "restraint of trade" "invokes the common law itself, . . . not merely the static content that the common law had assigned to the term in 1890." *Business Electronics*, *supra,* at 732. The general restraint on alienation, especially in the age when then-Justice Hughes used the term, tended to evoke policy concerns extraneous to the question that controls here. Usually associated with land, not chattels, the rule arose from restrictions removing real property from the stream of commerce for generations. The Court should be cautious about putting dispositive weight on doctrines from antiquity but of slight relevance. We reaffirm that "the state of the common law 400 or even 100 years ago is irrelevant to the issue before us: the effect of the antitrust laws upon vertical distributional restraints in the American economy today." *GTE Sylvania*, 433 U. S., at 53, n. 21 (internal quotation marks omitted).

*Dr. Miles*, furthermore, treated vertical agreements a manufacturer makes with its distributors as analogous to a horizontal combination among competing distributors. See 220 U. S., at 407–408. In later cases, however, the Court rejected the approach of reliance on rules governing horizontal restraints when defining rules applicable to vertical ones. See, *e.g., Business Electronics*, *supra,* at 734 (disclaiming the "notion of equivalence between the scope of horizontal *per se* illegality and that of vertical *per se* illegality"); *Maricopa County*, *supra,* at 348, n. 18 (noting that "horizontal restraints are generally less defensible than vertical restraints"). Our recent cases formulate antitrust principles in accordance with the appreciated differences in economic effect between vertical and horizontal agreements, differences the *Dr. Miles* Court failed to consider.

The reasons upon which *Dr. Miles* relied do not justify a

*per se* rule. As a consequence, it is necessary to examine, in the first instance, the economic effects of vertical agreements to fix minimum resale prices, and to determine whether the *per se* rule is nonetheless appropriate. See *Business Electronics*, 485 U. S., at 726.

A

Though each side of the debate can find sources to support its position, it suffices to say here that economics literature is replete with procompetitive justifications for a manufacturer's use of resale price maintenance. See, *e.g.,* Brief for Economists as *Amici Curiae* 16 ("In the theoretical literature, it is essentially undisputed that minimum [resale price maintenance] can have procompetitive effects and that under a variety of market conditions it is unlikely to have anticompetitive effects"); Brief for United States as *Amicus Curiae* 9 ("[T]here is a widespread consensus that permitting a manufacturer to control the price at which its goods are sold may promote *inter*brand competition and consumer welfare in a variety of ways"); ABA Section of Antitrust Law, Antitrust Law and Economics of Product Distribution 76 (2006) ("[T]he bulk of the economic literature on [resale price maintenance] suggests that [it] is more likely to be used to enhance efficiency than for anticompetitive purposes"); see also H. Hovenkamp, The Antitrust Enterprise: Principle and Execution 184–191 (2005) (hereinafter Hovenkamp); R. Bork, The Antitrust Paradox 288–291 (1978) (hereinafter Bork). Even those more skeptical of resale price maintenance acknowledge it can have procompetitive effects. See, *e.g.,* Brief for William S. Comanor et al. as *Amici Curiae* 3 ("[G]iven [the] diversity of effects [of resale price maintenance], one could reasonably take the position that a *rule of reason* rather than a *per se* approach is warranted"); F.M. Scherer & D. Ross, Industrial Market Structure and Economic Performance 558 (3d ed. 1990) (hereinafter

Scherer & Ross) ("The overall balance between benefits and costs [of resale price maintenance] is probably close").

The few recent studies documenting the competitive effects of resale price maintenance also cast doubt on the conclusion that the practice meets the criteria for a *per se* rule. See T. Overstreet, Resale Price Maintenance: Economic Theories and Empirical Evidence 170 (1983) (hereinafter Overstreet) (noting that "[e]fficient uses of [resale price maintenance] are evidently not unusual or rare"); see also Ippolito, Resale Price Maintenance: Empirical Evidence From Litigation, 34 J. Law & Econ. 263, 292–293 (1991) (hereinafter Ippolito).

The justifications for vertical price restraints are similar to those for other vertical restraints. See *GTE Sylvania*, 433 U. S., at 54–57. Minimum resale price maintenance can stimulate interbrand competition—the competition among manufacturers selling different brands of the same type of product—by reducing intrabrand competition—the competition among retailers selling the same brand. See *id.,* at 51–52. The promotion of interbrand competition is important because "the primary purpose of the antitrust laws is to protect [this type of] competition." *Khan*, 522 U. S., at 15. A single manufacturer's use of vertical price restraints tends to eliminate intrabrand price competition; this in turn encourages retailers to invest in tangible or intangible services or promotional efforts that aid the manufacturer's position as against rival manufacturers. Resale price maintenance also has the potential to give consumers more options so that they can choose among low-price, low-service brands; high-price, high-service brands; and brands that fall in between.

Absent vertical price restraints, the retail services that enhance interbrand competition might be underprovided. This is because discounting retailers can free ride on retailers who furnish services and then capture some of the increased demand those services generate. *GTE Syl-*

*vania*, *supra,* at 55. Consumers might learn, for example, about the benefits of a manufacturer's product from a retailer that invests in fine showrooms, offers product demonstrations, or hires and trains knowledgeable employees. R. Posner, Antitrust Law 172–173 (2d ed. 2001) (hereinafter Posner). Or consumers might decide to buy the product because they see it in a retail establishment that has a reputation for selling high-quality merchandise. Marvel & McCafferty, Resale Price Maintenance and Quality Certification, 15 Rand J. Econ. 346, 347–349 (1984) (hereinafter Marvel & McCafferty). If the consumer can then buy the product from a retailer that discounts because it has not spent capital providing services or developing a quality reputation, the high-service retailer will lose sales to the discounter, forcing it to cut back its services to a level lower than consumers would otherwise prefer. Minimum resale price maintenance alleviates the problem because it prevents the discounter from undercutting the service provider. With price competition decreased, the manufacturer's retailers compete among themselves over services.

Resale price maintenance, in addition, can increase interbrand competition by facilitating market entry for new firms and brands. "[N]ew manufacturers and manufacturers entering new markets can use the restrictions in order to induce competent and aggressive retailers to make the kind of investment of capital and labor that is often required in the distribution of products unknown to the consumer." *GTE Sylvania*, *supra,* at 55; see Marvel & McCafferty 349 (noting that reliance on a retailer's reputation "will decline as the manufacturer's brand becomes better known, so that [resale price maintenance] may be particularly important as a competitive device for new entrants"). New products and new brands are essential to a dynamic economy, and if markets can be penetrated by using resale price maintenance there is a procompetitive

effect.

Resale price maintenance can also increase interbrand competition by encouraging retailer services that would not be provided even absent free riding. It may be difficult and inefficient for a manufacturer to make and enforce a contract with a retailer specifying the different services the retailer must perform. Offering the retailer a guaranteed margin and threatening termination if it does not live up to expectations may be the most efficient way to expand the manufacturer's market share by inducing the retailer's performance and allowing it to use its own initiative and experience in providing valuable services. See Mathewson & Winter, The Law and Economics of Resale Price Maintenance, 13 Rev. Indus. Org. 57, 74–75 (1998) (hereinafter Mathewson & Winter); Klein & Murphy, Vertical Restraints as Contract Enforcement Mechanisms, 31 J. Law & Econ. 265, 295 (1988); see also Deneckere, Marvel, & Peck, Demand Uncertainty, Inventories, and Resale Price Maintenance, 111 Q. J. Econ. 885, 911 (1996) (noting that resale price maintenance may be beneficial to motivate retailers to stock adequate inventories of a manufacturer's goods in the face of uncertain consumer demand).

B

While vertical agreements setting minimum resale prices can have procompetitive justifications, they may have anticompetitive effects in other cases; and unlawful price fixing, designed solely to obtain monopoly profits, is an ever present temptation. Resale price maintenance may, for example, facilitate a manufacturer cartel. See *Business Electronics*, 485 U. S., at 725. An unlawful cartel will seek to discover if some manufacturers are undercutting the cartel's fixed prices. Resale price maintenance could assist the cartel in identifying price-cutting manufacturers who benefit from the lower prices they offer.

Resale price maintenance, furthermore, could discourage a manufacturer from cutting prices to retailers with the concomitant benefit of cheaper prices to consumers. See *ibid.;* see also Posner 172; Overstreet 19–23.

Vertical price restraints also "might be used to organize cartels at the retailer level." *Business Electronics*, *supra,* at 725–726. A group of retailers might collude to fix prices to consumers and then compel a manufacturer to aid the unlawful arrangement with resale price maintenance. In that instance the manufacturer does not establish the practice to stimulate services or to promote its brand but to give inefficient retailers higher profits. Retailers with better distribution systems and lower cost structures would be prevented from charging lower prices by the agreement. See Posner 172; Overstreet 13–19. Historical examples suggest this possibility is a legitimate concern. See, *e.g.,* Marvel & McCafferty, The Welfare Effects of Resale Price Maintenance, 28 J. Law & Econ. 363, 373 (1985) (hereinafter Marvel) (providing an example of the power of the National Association of Retail Druggists to compel manufacturers to use resale price maintenance); Hovenkamp 186 (suggesting that the retail druggists in *Dr. Miles* formed a cartel and used manufacturers to enforce it).

A horizontal cartel among competing manufacturers or competing retailers that decreases output or reduces competition in order to increase price is, and ought to be, *per se* unlawful. See *Texaco*, 547 U. S., at 5; *GTE Sylvania*, 433 U. S., at 58, n. 28. To the extent a vertical agreement setting minimum resale prices is entered upon to facilitate either type of cartel, it, too, would need to be held unlawful under the rule of reason. This type of agreement may also be useful evidence for a plaintiff attempting to prove the existence of a horizontal cartel.

Resale price maintenance, furthermore, can be abused by a powerful manufacturer or retailer. A dominant re-

tailer, for example, might request resale price mainte-
nance to forestall innovation in distribution that decreases
costs. A manufacturer might consider it has little choice
but to accommodate the retailer's demands for vertical
price restraints if the manufacturer believes it needs
access to the retailer's distribution network. See
Overstreet 31; 8 P. Areeda & H. Hovenkamp, Antitrust
Law 47 (2d ed. 2004) (hereinafter Areeda & Hovenkamp);
cf. *Toys "R" Us, Inc.* v. *FTC*, 221 F. 3d 928, 937–938 (CA7
2000). A manufacturer with market power, by compari-
son, might use resale price maintenance to give retailers
an incentive not to sell the products of smaller rivals or
new entrants. See, *e.g.,* Marvel 366–368. As should
be evident, the potential anticompetitive consequences
of vertical price restraints must not be ignored or
underestimated.

C

Notwithstanding the risks of unlawful conduct, it cannot
be stated with any degree of confidence that resale price
maintenance "always or almost always tend[s] to restrict
competition and decrease output." *Business Electronics*,
*supra,* at 723 (internal quotation marks omitted). Vertical
agreements establishing minimum resale prices can have
either procompetitive or anticompetitive effects, depending
upon the circumstances in which they are formed. And
although the empirical evidence on the topic is limited, it
does not suggest efficient uses of the agreements are
infrequent or hypothetical. See Overstreet 170; see also
*id.,* at 80 (noting that for the majority of enforcement
actions brought by the Federal Trade Commission be-
tween 1965 and 1982, "the use of [resale price mainte-
nance] was not likely motivated by collusive dealers who
had successfully coerced their suppliers"); Ippolito 292
(reaching a similar conclusion). As the rule would pro-
scribe a significant amount of procompetitive conduct,

these agreements appear ill suited for *per se* condemnation.

Respondent contends, nonetheless, that vertical price restraints should be *per se* unlawful because of the administrative convenience of *per se* rules. See, *e.g., GTE Sylvania*, *supra,* at 50, n. 16 (noting "*per se* rules tend to provide guidance to the business community and to minimize the burdens on litigants and the judicial system"). That argument suggests *per se* illegality is the rule rather than the exception. This misinterprets our antitrust law. *Per se* rules may decrease administrative costs, but that is only part of the equation. Those rules can be counterproductive. They can increase the total cost of the antitrust system by prohibiting procompetitive conduct the antitrust laws should encourage. See Easterbrook, Vertical Arrangements and the Rule of Reason, 53 Antitrust L. J. 135, 158 (1984) (hereinafter Easterbrook). They also may increase litigation costs by promoting frivolous suits against legitimate practices. The Court has thus explained that administrative "advantages are not sufficient in themselves to justify the creation of *per se* rules," *GTE Sylvania*, 433 U. S., at 50, n. 16, and has relegated their use to restraints that are "manifestly anticompetitive," *id.,* at 49–50. Were the Court now to conclude that vertical price restraints should be *per se* illegal based on administrative costs, we would undermine, if not overrule, the traditional "demanding standards" for adopting *per se* rules. *Id.,* at 50. Any possible reduction in administrative costs cannot alone justify the *Dr. Miles* rule.

Respondent also argues the *per se* rule is justified because a vertical price restraint can lead to higher prices for the manufacturer's goods. See also Overstreet 160 (noting that "price surveys indicate that [resale price maintenance] in most cases increased the prices of products sold"). Respondent is mistaken in relying on pricing effects absent a further showing of anticompetitive con-

duct. Cf. *id.,* at 106 (explaining that price surveys "do not necessarily tell us anything conclusive about the welfare effects of [resale price maintenance] because the results are generally consistent with both procompetitive and anticompetitive theories"). For, as has been indicated already, the antitrust laws are designed primarily to protect interbrand competition, from which lower prices can later result. See *Khan,* 522 U. S., at 15. The Court, moreover, has evaluated other vertical restraints under the rule of reason even though prices can be increased in the course of promoting procompetitive effects. See, *e.g., Business Electronics,* 485 U. S., at 728. And resale price maintenance may reduce prices if manufacturers have resorted to costlier alternatives of controlling resale prices that are not *per se* unlawful. See *infra,* at 22–25; see also Marvel 371.

Respondent's argument, furthermore, overlooks that, in general, the interests of manufacturers and consumers are aligned with respect to retailer profit margins. The difference between the price a manufacturer charges retailers and the price retailers charge consumers represents part of the manufacturer's cost of distribution, which, like any other cost, the manufacturer usually desires to minimize. See *GTE Sylvania,* 433 U. S., at 56, n. 24; see also *id.,* at 56 ("Economists . . . have argued that manufacturers have an economic interest in maintaining as much intrabrand competition as is consistent with the efficient distribution of their products"). A manufacturer has no incentive to overcompensate retailers with unjustified margins. The retailers, not the manufacturer, gain from higher retail prices. The manufacturer often loses; interbrand competition reduces its competitiveness and market share because consumers will "substitute a different brand of the same product." *Id.,* at 52, n. 19; see *Business Electronics, supra,* at 725. As a general matter, therefore, a single manufacturer will desire to set minimum resale prices only if the

"increase in demand resulting from enhanced service . . . will more than offset a negative impact on demand of a higher retail price." Mathewson & Winter 67.

The implications of respondent's position are far reaching. Many decisions a manufacturer makes and carries out through concerted action can lead to higher prices. A manufacturer might, for example, contract with different suppliers to obtain better inputs that improve product quality. Or it might hire an advertising agency to promote awareness of its goods. Yet no one would think these actions violate the Sherman Act because they lead to higher prices. The antitrust laws do not require manufacturers to produce generic goods that consumers do not know about or want. The manufacturer strives to improve its product quality or to promote its brand because it believes this conduct will lead to increased demand despite higher prices. The same can hold true for resale price maintenance.

Resale price maintenance, it is true, does have economic dangers. If the rule of reason were to apply to vertical price restraints, courts would have to be diligent in eliminating their anticompetitive uses from the market. This is a realistic objective, and certain factors are relevant to the inquiry. For example, the number of manufacturers that make use of the practice in a given industry can provide important instruction. When only a few manufacturers lacking market power adopt the practice, there is little likelihood it is facilitating a manufacturer cartel, for a cartel then can be undercut by rival manufacturers. See Overstreet 22; Bork 294. Likewise, a retailer cartel is unlikely when only a single manufacturer in a competitive market uses resale price maintenance. Interbrand competition would divert consumers to lower priced substitutes and eliminate any gains to retailers from their price-fixing agreement over a single brand. See Posner 172; Bork 292. Resale price maintenance should be subject to more care-

ful scrutiny, by contrast, if many competing manufacturers adopt the practice. Cf. Scherer & Ross 558 (noting that "except when [resale price maintenance] spreads to cover the bulk of an industry's output, depriving consumers of a meaningful choice between high-service and low-price outlets, most [resale price maintenance arrangements] are probably innocuous"); Easterbrook 162 (suggesting that "every one of the potentially-anticompetitive outcomes of vertical arrangements depends on the uniformity of the practice").

The source of the restraint may also be an important consideration. If there is evidence retailers were the impetus for a vertical price restraint, there is a greater likelihood that the restraint facilitates a retailer cartel or supports a dominant, inefficient retailer. See Brief for William S. Comanor et al. as *Amici Curiae* 7–8. If, by contrast, a manufacturer adopted the policy independent of retailer pressure, the restraint is less likely to promote anticompetitive conduct. Cf. Posner 177 ("It makes all the difference whether minimum retail prices are imposed by the manufacturer in order to evoke point-of-sale services or by the dealers in order to obtain monopoly profits"). A manufacturer also has an incentive to protest inefficient retailer-induced price restraints because they can harm its competitive position.

As a final matter, that a dominant manufacturer or retailer can abuse resale price maintenance for anticompetitive purposes may not be a serious concern unless the relevant entity has market power. If a retailer lacks market power, manufacturers likely can sell their goods through rival retailers. See also *Business Electronics*, *supra,* at 727, n. 2 (noting "[r]etail market power is rare, because of the usual presence of interbrand competition and other dealers"). And if a manufacturer lacks market power, there is less likelihood it can use the practice to keep competitors away from distribution outlets.

The rule of reason is designed and used to eliminate anticompetitive transactions from the market. This standard principle applies to vertical price restraints. A party alleging injury from a vertical agreement setting minimum resale prices will have, as a general matter, the information and resources available to show the existence of the agreement and its scope of operation. As courts gain experience considering the effects of these restraints by applying the rule of reason over the course of decisions, they can establish the litigation structure to ensure the rule operates to eliminate anticompetitive restraints from the market and to provide more guidance to businesses. Courts can, for example, devise rules over time for offering proof, or even presumptions where justified, to make the rule of reason a fair and efficient way to prohibit anticompetitive restraints and to promote procompetitive ones.

For all of the foregoing reasons, we think that were the Court considering the issue as an original matter, the rule of reason, not a *per se* rule of unlawfulness, would be the appropriate standard to judge vertical price restraints.

## IV

We do not write on a clean slate, for the decision in *Dr. Miles* is almost a century old. So there is an argument for its retention on the basis of *stare decisis* alone. Even if *Dr. Miles* established an erroneous rule, "*[s]tare decisis* reflects a policy judgment that in most matters it is more important that the applicable rule of law be settled than that it be settled right." *Khan*, 522 U. S., at 20 (internal quotation marks omitted). And concerns about maintaining settled law are strong when the question is one of statutory interpretation. See, *e.g., Hohn* v. *United States*, 524 U. S. 236, 251 (1998).

*Stare decisis* is not as significant in this case, however, because the issue before us is the scope of the Sherman Act. *Khan, supra,* at 20 ("[T]he general presumption that

legislative changes should be left to Congress has less force with respect to the Sherman Act"). From the beginning the Court has treated the Sherman Act as a common-law statute. See *National Soc. of Professional Engineers* v. *United States*, 435 U. S. 679, 688 (1978); see also *Northwest Airlines, Inc.* v. *Transport Workers*, 451 U. S. 77, 98, n. 42 (1981) ("In antitrust, the federal courts . . . act more as common-law courts than in other areas governed by federal statute"). Just as the common law adapts to modern understanding and greater experience, so too does the Sherman Act's prohibition on "restraint[s] of trade" evolve to meet the dynamics of present economic conditions. The case-by-case adjudication contemplated by the rule of reason has implemented this common-law approach. See *National Soc. of Professional Engineers*, *supra,* at 688. Likewise, the boundaries of the doctrine of *per se* illegality should not be immovable. For "[i]t would make no sense to create out of the single term 'restraint of trade' a chronologically schizoid statute, in which a 'rule of reason' evolves with new circumstance and new wisdom, but a line of *per se* illegality remains forever fixed where it was." *Business Electronics*, 485 U. S., at 732.

## A

*Stare decisis*, we conclude, does not compel our continued adherence to the *per se* rule against vertical price restraints. As discussed earlier, respected authorities in the economics literature suggest the *per se* rule is inappropriate, and there is now widespread agreement that resale price maintenance can have procompetitive effects. See, *e.g.,* Brief for Economists as *Amici Curiae* 16. It is also significant that both the Department of Justice and the Federal Trade Commission—the antitrust enforcement agencies with the ability to assess the long-term impacts of resale price maintenance—have recommended that this Court replace the *per se* rule with the traditional

rule of reason. See Brief for United States as *Amicus Curiae* 6. In the antitrust context the fact that a decision has been "called into serious question" justifies our re-evaluation of it. *Khan*, *supra,* at 21.

Other considerations reinforce the conclusion that *Dr. Miles* should be overturned. Of most relevance, "we have overruled our precedents when subsequent cases have undermined their doctrinal underpinnings." *Dickerson* v. *United States*, 530 U. S. 428, 443 (2000). The Court's treatment of vertical restraints has progressed away from *Dr. Miles'* strict approach. We have distanced ourselves from the opinion's rationales. See *supra,* at 7–8; see also *Khan*, *supra,* at 21 (overruling a case when "the views underlying [it had been] eroded by this Court's precedent"); *Rodriguez de Quijas* v. *Shearson/American Express, Inc.*, 490 U. S. 477, 480–481 (1989) (same). This is unsurprising, for the case was decided not long after enactment of the Sherman Act when the Court had little experience with antitrust analysis. Only eight years after *Dr. Miles*, moreover, the Court reined in the decision by holding that a manufacturer can announce suggested resale prices and refuse to deal with distributors who do not follow them. *Colgate*, 250 U. S., at 307–308.

In more recent cases the Court, following a common-law approach, has continued to temper, limit, or overrule once strict prohibitions on vertical restraints. In 1977, the Court overturned the *per se* rule for vertical nonprice restraints, adopting the rule of reason in its stead. *GTE Sylvania*, 433 U. S., at 57–59 (overruling *United States* v. *Arnold, Schwinn & Co.*, 388 U. S. 365 (1967)); see also 433 U. S., at 58, n. 29 (noting "that the advantages of vertical restrictions should not be limited to the categories of new entrants and failing firms"). While the Court in a footnote in *GTE Sylvania* suggested that differences between vertical price and nonprice restraints could support different legal treatment, see 433 U. S., at 51, n. 18, the central

part of the opinion relied on authorities and arguments that find unequal treatment "difficult to justify," *id.,* at 69–70 (White, J., concurring in judgment).

Continuing in this direction, in two cases in the 1980's the Court defined legal rules to limit the reach of *Dr. Miles* and to accommodate the doctrines enunciated in *GTE Sylvania* and *Colgate.* See *Business Electronics, supra,* at 726–728; *Monsanto*, 465 U. S., at 763–764. In *Monsanto*, the Court required that antitrust plaintiffs alleging a §1 price-fixing conspiracy must present evidence tending to exclude the possibility a manufacturer and its distributors acted in an independent manner. *Id.,* at 764. Unlike Justice Brennan's concurrence, which rejected arguments that *Dr. Miles* should be overruled, see 465 U. S., at 769, the Court "decline[d] to reach the question" whether vertical agreements fixing resale prices always should be unlawful because neither party suggested otherwise, *id.,* at 761–762, n. 7. In *Business Electronics* the Court further narrowed the scope of *Dr. Miles*. It held that the *per se* rule applied only to specific agreements over price levels and not to an agreement between a manufacturer and a distributor to terminate a price-cutting distributor. 485 U. S., at 726–727, 735–736.

Most recently, in 1997, after examining the issue of vertical maximum price-fixing agreements in light of commentary and real experience, the Court overruled a 29-year-old precedent treating those agreements as *per se* illegal. *Khan*, 522 U. S., at 22 (overruling *Albrecht* v. *Herald Co.*, 390 U. S. 145 (1968)). It held instead that they should be evaluated under the traditional rule of reason. 522 U. S., at 22. Our continued limiting of the reach of the decision in *Dr. Miles* and our recent treatment of other vertical restraints justify the conclusion that *Dr. Miles* should not be retained.

The *Dr. Miles* rule is also inconsistent with a principled framework, for it makes little economic sense when ana-

lyzed with our other cases on vertical restraints. If we were to decide the procompetitive effects of resale price maintenance were insufficient to overrule *Dr. Miles*, then cases such as *Colgate* and *GTE Sylvania* themselves would be called into question. These later decisions, while they may result in less intrabrand competition, can be justified because they permit manufacturers to secure the procompetitive benefits associated with vertical price restraints through other methods. The other methods, however, could be less efficient for a particular manufacturer to establish and sustain. The end result hinders competition and consumer welfare because manufacturers are forced to engage in second-best alternatives and because consumers are required to shoulder the increased expense of the inferior practices.

The manufacturer has a number of legitimate options to achieve benefits similar to those provided by vertical price restraints. A manufacturer can exercise its *Colgate* right to refuse to deal with retailers that do not follow its suggested prices. See 250 U. S., at 307. The economic effects of unilateral and concerted price setting are in general the same. See, *e.g., Monsanto*, 465 U. S., at 762–764. The problem for the manufacturer is that a jury might conclude its unilateral policy was really a vertical agreement, subjecting it to treble damages and potential criminal liability. *Ibid.; Business Electronics*, *supra,* at 728. Even with the stringent standards in *Monsanto* and *Business Electronics*, this danger can lead, and has led, rational manufacturers to take wasteful measures. See, *e.g.,* Brief for PING, Inc., as *Amicus Curiae* 9–18. A manufacturer might refuse to discuss its pricing policy with its distributors except through counsel knowledgeable of the subtle intricacies of the law. Or it might terminate longstanding distributors for minor violations without seeking an explanation. See *ibid*. The increased costs these burdensome measures generate flow to consumers in the form of

higher prices.

Furthermore, depending on the type of product it sells, a manufacturer might be able to achieve the procompetitive benefits of resale price maintenance by integrating downstream and selling its products directly to consumers. *Dr. Miles* tilts the relative costs of vertical integration and vertical agreement by making the former more attractive based on the *per se* rule, not on real market conditions. See *Business Electronics*, *supra,* at 725; see generally Coase, The Nature of the Firm, 4 Economica, New Series 386 (1937). This distortion might lead to inefficient integration that would not otherwise take place, so that consumers must again suffer the consequences of the suboptimal distribution strategy. And integration, unlike vertical price restraints, eliminates all intrabrand competition. See, *e.g., GTE Sylvania*, 433 U. S., at 57, n. 26.

There is yet another consideration. A manufacturer can impose territorial restrictions on distributors and allow only one distributor to sell its goods in a given region. Our cases have recognized, and the economics literature confirms, that these vertical nonprice restraints have impacts similar to those of vertical price restraints; both reduce intrabrand competition and can stimulate retailer services. See, *e.g., Business Electronics*, *supra,* at 728; *Monsanto*, *supra,* at 762–763; see also Brief for Economists as *Amici Curiae* 17–18. Cf. Scherer & Ross 560 (noting that vertical nonprice restraints "can engender inefficiencies at least as serious as those imposed upon the consumer by resale price maintenance"); Steiner, How Manufacturers Deal with the Price-Cutting Retailer: When Are Vertical Restraints Efficient?, 65 Antitrust L. J. 407, 446–447 (1997) (indicating that "antitrust law should recognize that the consumer interest is often better served by [resale price maintenance]—contrary to its per se illegality and the rule-of-reason status of vertical nonprice restraints"). The same legal standard (*per se* unlawfulness) applies to

horizontal market division and horizontal price fixing because both have similar economic effect. There is likewise little economic justification for the current differential treatment of vertical price and nonprice restraints. Furthermore, vertical nonprice restraints may prove less efficient for inducing desired services, and they reduce intrabrand competition more than vertical price restraints by eliminating both price and service competition. See Brief for Economists as *Amici Curiae* 17–18.

In sum, it is a flawed antitrust doctrine that serves the interests of lawyers—by creating legal distinctions that operate as traps for the unwary—more than the interests of consumers—by requiring manufacturers to choose second-best options to achieve sound business objectives.

## B

Respondent's arguments for reaffirming *Dr. Miles* on the basis of *stare decisis* do not require a different result. Respondent looks to congressional action concerning vertical price restraints. In 1937, Congress passed the Miller-Tydings Fair Trade Act, 50 Stat. 693, which made vertical price restraints legal if authorized by a fair trade law enacted by a State. Fifteen years later, Congress expanded the exemption to permit vertical price-setting agreements between a manufacturer and a distributor to be enforced against other distributors not involved in the agreement. McGuire Act, 66 Stat. 632. In 1975, however, Congress repealed both Acts. Consumer Goods Pricing Act, 89 Stat. 801. That the *Dr. Miles* rule applied to vertical price restraints in 1975, according to respondent, shows Congress ratified the rule.

This is not so. The text of the Consumer Goods Pricing Act did not codify the rule of *per se* illegality for vertical price restraints. It rescinded statutory provisions that made them *per se* legal. Congress once again placed these restraints within the ambit of §1 of the Sherman Act.

And, as has been discussed, Congress intended §1 to give courts the ability "to develop governing principles of law" in the common-law tradition. *Texas Industries, Inc.* v. *Radcliff Materials, Inc.*, 451 U. S. 630, 643 (1981); see *Business Electronics*, 485 U. S., at 731 ("The changing content of the term 'restraint of trade' was well recognized at the time the Sherman Act was enacted"). Congress could have set the *Dr. Miles* rule in stone, but it chose a more flexible option. We respect its decision by analyzing vertical price restraints, like all restraints, in conformance with traditional §1 principles, including the principle that our antitrust doctrines "evolv[e] with new circumstances and new wisdom." *Business Electronics, supra,* at 732; see also Easterbrook 139.

The rule of reason, furthermore, is not inconsistent with the Consumer Goods Pricing Act. Unlike the earlier congressional exemption, it does not treat vertical price restraints as *per se* legal. In this respect, the justifications for the prior exemption are illuminating. Its goal "was to allow the States to protect small retail establishments that Congress thought might otherwise be driven from the marketplace by large-volume discounters." *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97, 102 (1980). The state fair trade laws also appear to have been justified on similar grounds. See Areeda & Hovenkamp 298. The rationales for these provisions are foreign to the Sherman Act. Divorced from competition and consumer welfare, they were designed to save inefficient small retailers from their inability to compete. The purpose of the antitrust laws, by contrast, is "the protection of *competition*, not *competitors*." *Atlantic Richfield Co.* v. *USA Petroleum Co.*, 495 U. S. 328, 338 (1990) (internal quotation marks omitted). To the extent Congress repealed the exemption for some vertical price restraints to end its prior practice of encouraging anticompetitive conduct, the rule of reason promotes the same objective.

Respondent also relies on several congressional appropriations in the mid-1980's in which Congress did not permit the Department of Justice or the Federal Trade Commission to use funds to advocate overturning *Dr. Miles.* See, *e.g.,* 97 Stat. 1071. We need not pause long in addressing this argument. The conditions on funding are no longer in place, see, *e.g.,* Brief for United States as *Amicus Curiae* 21, and they were ambiguous at best. As much as they might show congressional approval for *Dr. Miles*, they might demonstrate a different proposition: that Congress could not pass legislation codifying the rule and reached a short-term compromise instead.

Reliance interests do not require us to reaffirm *Dr. Miles.* To be sure, reliance on a judicial opinion is a significant reason to adhere to it, *Payne* v. *Tennessee*, 501 U. S. 808, 828 (1991), especially "in cases involving property and contract rights," *Khan*, 522 U. S., at 20. The reliance interests here, however, like the reliance interests in *Khan*, cannot justify an inefficient rule, especially because the narrowness of the rule has allowed manufacturers to set minimum resale prices in other ways. And while the *Dr. Miles* rule is longstanding, resale price maintenance was legal under fair trade laws in a majority of States for a large part of the past century up until 1975.

It is also of note that during this time "when the legal environment in the [United States] was most favorable for [resale price maintenance], no more than a tiny fraction of manufacturers ever employed [resale price maintenance] contracts." Overstreet 6; see also *id.,* at 169 (noting that "no more than one percent of manufacturers, accounting for no more than ten percent of consumer goods purchases, ever employed [resale price maintenance] in any single year in the [United States]"); Scherer & Ross 549 (noting that "[t]he fraction of U.S. retail sales covered by [resale price maintenance] in its heyday has been variously estimated at from 4 to 10 percent"). To the extent consumers

demand cheap goods, judging vertical price restraints under the rule of reason will not prevent the market from providing them. Cf. Easterbrook 152–153 (noting that "S.S. Kresge (the old K-Mart) flourished during the days of manufacturers' greatest freedom" because "discount stores offer a combination of price and service that many customers value" and that "[n]othing in restricted dealing threatens the ability of consumers to find low prices"); Scherer & Ross 557 (noting that "for the most part, the effects of the [Consumer Goods Pricing Act] were imperceptible because the forces of competition had already repealed the [previous antitrust exemption] in their own quiet way").

For these reasons the Court's decision in *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S. 373 (1911), is now overruled. Vertical price restraints are to be judged according to the rule of reason.

V

Noting that Leegin's president has an ownership interest in retail stores that sell Brighton, respondent claims Leegin participated in an unlawful horizontal cartel with competing retailers. Respondent did not make this allegation in the lower courts, and we do not consider it here.

The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

No. 06–480

LEEGIN CREATIVE LEATHER PRODUCTS, INC.,
PETITIONER *v.* PSKS, INC., DBA KAY'S
KLOSET . . . KAY'S SHOES

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE FIFTH CIRCUIT

[June 28, 2007]

JUSTICE BREYER, with whom JUSTICE STEVENS, JUSTICE SOUTER, and JUSTICE GINSBURG join, dissenting.

In *Dr. Miles Medical Co.* v. *John D. Park & Sons Co.*, 220 U. S. 373, 394, 408–409 (1911), this Court held that an agreement between a manufacturer of proprietary medicines and its dealers to fix the minimum price at which its medicines could be sold was "invalid . . . under the [Sherman Act, 15 U. S. C. §1]." This Court has consistently read *Dr. Miles* as establishing a bright-line rule that agreements fixing minimum resale prices are *per se* illegal. See, *e.g.*, *United States* v. *Trenton Potteries Co.*, 273 U. S. 392, 399–401 (1927); *NYNEX Corp.* v. *Discon, Inc.*, 525 U. S. 128, 133 (1998). That *per se* rule is one upon which the legal profession, business, and the public have relied for close to a century. Today the Court holds that courts must determine the lawfulness of minimum resale price maintenance by applying, not a bright-line *per se* rule, but a circumstance-specific "rule of reason." *Ante*, at 28. And in doing so it overturns *Dr. Miles*.

The Court justifies its departure from ordinary considerations of *stare decisis* by pointing to a set of arguments well known in the antitrust literature for close to half a century. See *ante*, at 10–12. Congress has repeatedly

found in these arguments insufficient grounds for over-
turning the *per se* rule. See, *e.g.*, Hearings on H. R. 10527
et al. before the Subcommittee on Commerce and Finance
of the House Committee on Interstate and Foreign Com-
merce, 85th Cong., 2d Sess., 74–76, 89, 99, 101–102, 192–
195, 261–262 (1958). And, in my view, they do not war-
rant the Court's now overturning so well-established a
legal precedent.

I

The Sherman Act seeks to maintain a marketplace free
of anticompetitive practices, in particular those enforced
by agreement among private firms. The law assumes that
such a marketplace, free of private restrictions, will tend
to bring about the lower prices, better products, and more
efficient production processes that consumers typically
desire. In determining the lawfulness of particular prac-
tices, courts often apply a "rule of reason." They examine
both a practice's likely anticompetitive effects and its
beneficial business justifications. See, *e.g.*, *National Col-
legiate Athletic Assn.* v. *Board of Regents of Univ. of Okla.*,
468 U. S. 85, 109–110, and n. 39 (1984); *National Soc. of
Professional Engineers* v. *United States*, 435 U. S. 679,
688–691 (1978); *Board of Trade of Chicago* v. *United
States*, 246 U. S. 231, 238 (1918).

Nonetheless, sometimes the likely anticompetitive
consequences of a particular practice are so serious and
the potential justifications so few (or, *e.g.*, so difficult to
prove) that courts have departed from a pure "rule of
reason" approach. And sometimes this Court has imposed
a rule of *per se* unlawfulness—a rule that instructs courts
to find the practice unlawful all (or nearly all) the time.
See, *e.g.*, *NYNEX*, *supra*, at 133; *Arizona* v. *Maricopa
County Medical Soc.*, 457 U. S. 332, 343–344, and n. 16
(1982); *Continental T. V., Inc.* v. *GTE Sylvania Inc.*, 433
U. S. 36, 50, n. 16 (1977); *United States* v. *Topco Associ-*

*ates, Inc.*, 405 U. S. 596, 609–611 (1972); *United States* v. *Socony-Vacuum Oil Co.*, 310 U. S. 150, 213–214 (1940) (citing and quoting *Trenton Potteries*, *supra*, at 397–398).

The case before us asks which kind of approach the courts should follow where minimum resale price maintenance is at issue. Should they apply a *per se* rule (or a variation) that would make minimum resale price maintenance always (or *almost* always) unlawful? Should they apply a "rule of reason"? Were the Court writing on a blank slate, I would find these questions difficult. But, of course, the Court is not writing on a blank slate, and that fact makes a considerable legal difference.

To best explain why the question would be difficult were we deciding it afresh, I briefly summarize several classical arguments for and against the use of a *per se* rule. The arguments focus on three sets of considerations, those involving: (1) potential anticompetitive effects, (2) potential benefits, and (3) administration. The difficulty arises out of the fact that the different sets of considerations point in different directions. See, *e.g.*, 8 P. Areeda, Antitrust Law ¶¶1628–1633, pp. 330–392 (1st ed. 1989) (hereinafter Areeda); 8 P. Areeda & H. Hovenkamp, Antitrust Law ¶¶1628–1633, pp. 288–339 (2d ed. 2004) (hereinafter Areeda & Hovenkamp); Easterbrook, Vertical Arrangements and the Rule of Reason, 53 Antitrust L. J. 135, 146–152 (1984) (hereinafter Easterbrook); Pitofsky, In Defense of Discounters: The No-Frills Case for a *Per Se* Rule Against Vertical Price Fixing, 71 Geo. L. J. 1487 (1983) (hereinafter Pitofsky); Scherer, The Economics of Vertical Restraints, 52 Antitrust L. J. 687, 706–707 (1983) (hereinafter Scherer); Posner, The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality, 48 U. Chi. L. Rev. 6, 22–26 (1981); Brief for William S. Comanor and Frederic M. Scherer as *Amici Curiae* 7–10.

On the one hand, agreements setting minimum resale prices may have serious anticompetitive consequences. *In*

*respect to dealers:* Resale price maintenance agreements, rather like horizontal price agreements, can diminish or eliminate price competition among dealers of a single brand or (if practiced generally by manufacturers) among multibrand dealers. In doing so, they can prevent dealers from offering customers the lower prices that many customers prefer; they can prevent dealers from responding to changes in demand, say falling demand, by cutting prices; they can encourage dealers to substitute service, for price, competition, thereby threatening wastefully to attract too many resources into that portion of the industry; they can inhibit expansion by more efficient dealers whose lower prices might otherwise attract more customers, stifling the development of new, more efficient modes of retailing; and so forth. See, *e.g.*, 8 Areeda & Hovenkamp ¶1632c, at 319–321; Steiner, The Evolution and Applications of Dual-Stage Thinking, 49 The Antitrust Bulletin 877, 899–900 (2004); Comanor, Vertical Price-Fixing, Vertical Market Restrictions, and the New Antitrust Policy, 98 Harv. L. Rev. 983, 990–1000 (1985).

   *In respect to producers:* Resale price maintenance agreements can help to reinforce the competition-inhibiting behavior of firms in concentrated industries. In such industries firms may tacitly collude, *i.e.*, observe each other's pricing behavior, each understanding that price cutting by one firm is likely to trigger price competition by all. See 8 Areeda & Hovenkamp ¶1632d, at 321–323; P. Areeda & L. Kaplow, Antitrust Analysis ¶¶231–233, pp. 276–283 (4th ed. 1988) (hereinafter Areeda & Kaplow). Cf. *United States* v. *Container Corp. of America*, 393 U. S. 333 (1969); Areeda & Kaplow ¶¶247–253, at 327–348. Where that is so, resale price maintenance can make it easier for each producer to identify (by observing retail markets) when a competitor has begun to cut prices. And a producer who cuts wholesale prices *without* lowering the minimum resale price will stand to gain little, if anything,

in increased profits, because the dealer will be unable to stimulate increased consumer demand by passing along the producer's price cut to consumers. In either case, resale price maintenance agreements will tend to prevent price competition from "breaking out"; and they will thereby tend to stabilize producer prices. See Pitofsky 1490–1491. Cf., *e.g.*, *Container Corp.*, *supra*, at 336–337.

Those who express concern about the potential anticompetitive effects find empirical support in the behavior of prices before, and then after, Congress in 1975 repealed the Miller-Tydings Fair Trade Act, 50 Stat. 693, and the McGuire Act, 66 Stat. 631. Those Acts had permitted (but not required) individual States to enact "fair trade" laws authorizing minimum resale price maintenance. At the time of repeal minimum resale price maintenance was lawful in 36 States; it was unlawful in 14 States. See Hearings on S. 408 before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary, 94th Cong., 1st Sess., 173 (1975) (hereinafter Hearings on S. 408) (statement of Thomas E. Kauper, Assistant Attorney General, Antitrust Division). Comparing prices in the former States with prices in the latter States, the Department of Justice argued that minimum resale price maintenance had raised prices by 19% to 27%. See Hearings on H. R. 2384 before the Subcommittee on Monopolies and Commercial Law of the House Committee on the Judiciary, 94th Cong., 1st Sess., 122 (1975) (hereinafter Hearings on H. R. 2384) (statement of Keith I. Clearwaters, Deputy Assistant Attorney General, Antitrust Division).

After repeal, minimum resale price maintenance agreements were unlawful *per se* in every State. The Federal Trade Commission (FTC) staff, after studying numerous price surveys, wrote that collectively the surveys "indicate[d] that [resale price maintenance] in most cases increased the prices of products sold with [resale price maintenance]." Bureau of Economics Staff Report to the

FTC, T. Overstreet, Resale Price Maintenance: Economic Theories and Empirical Evidence, 160 (1983) (hereinafter Overstreet). Most economists today agree that, in the words of a prominent antitrust treatise, "resale price maintenance tends to produce higher consumer prices than would otherwise be the case." 8 Areeda & Hovenkamp ¶1604b, at 40 (finding "[t]he evidence . . . persuasive on this point"). See also Brief for William S. Comanor and Frederic M. Scherer as *Amici Curiae* 4 ("It is uniformly acknowledged that [resale price maintenance] and other vertical restraints lead to higher consumer prices").

On the other hand, those favoring resale price maintenance have long argued that resale price maintenance agreements can provide important consumer benefits. The majority lists two: First, such agreements can facilitate new entry. *Ante*, at 11–12. For example, a newly entering producer wishing to build a product name might be able to convince dealers to help it do so—if, but only if, the producer can assure those dealers that they will later recoup their investment. Without resale price maintenance, late-entering dealers might take advantage of the earlier investment and, through price competition, drive prices down to the point where the early dealers cannot recover what they spent. By assuring the initial dealers that such later price competition will not occur, resale price maintenance can encourage them to carry the new product, thereby helping the new producer succeed. See 8 Areeda & Hovenkamp ¶¶1617a, 1631b, at 193–196, 308. The result might be increased competition at the producer level, *i.e.*, greater *inter*-brand competition, that brings with it net consumer benefits.

Second, without resale price maintenance a producer might find its efforts to sell a product undermined by what resale price maintenance advocates call "free riding." *Ante*, at 10–11. Suppose a producer concludes that it can succeed only if dealers provide certain services, say, prod-

uct demonstrations, high quality shops, advertising that creates a certain product image, and so forth. Without resale price maintenance, some dealers might take a "free ride" on the investment that others make in providing those services. Such a dealer would save money by not paying for those services and could consequently cut its own price and increase its own sales. Under these circumstances, dealers might prove unwilling to invest in the provision of necessary services. See, *e.g.*, 8 Areeda & Hovenkamp ¶¶1611–1613, 1631c, at 126–165, 309–313; R. Posner, Antitrust Law 172–173 (2d ed. 2001); R. Bork, The Antitrust Paradox 290–291 (1978) (hereinafter Bork); Easterbrook 146–149.

Moreover, where a producer and not a group of dealers seeks a resale price maintenance agreement, there is a special reason to believe some such benefits exist. That is because, other things being equal, producers should want to encourage price competition among their dealers. By doing so they will often increase profits by selling more of their product. See *Sylvania*, 433 U. S., at 56, n. 24; Bork 290. And that is so, even if the producer possesses sufficient market power to earn a super-normal profit. That is to say, other things being equal, the producer will benefit by charging his dealers a competitive (or even a higher-than-competitive) wholesale price while encouraging price competition among them. Hence, if the producer is the moving force, the producer must have some special reason for wanting resale price maintenance; and in the absence of, say, concentrated producer markets (where that special reason might consist of a desire to stabilize wholesale prices), that special reason may well reflect the special circumstances just described: new entry, "free riding," or variations on those themes.

The upshot is, as many economists suggest, sometimes resale price maintenance can prove harmful; sometimes it can bring benefits. See, *e.g.*, Brief for Economists as *Amici*

*Curiae* 16; 8 Areeda & Hovenkamp ¶¶1631–1632, at 306–328; Pitofsky 1495; Scherer 706–707.  But before concluding that courts should consequently apply a rule of reason, I would ask such questions as, how often are harms or benefits likely to occur?  How easy is it to separate the beneficial sheep from the antitrust goats?

Economic discussion, such as the studies the Court relies upon, can *help* provide answers to these questions, and in doing so, economics can, and should, inform antitrust law.  But antitrust law cannot, and should not, precisely replicate economists' (sometimes conflicting) views.  That is because law, unlike economics, is an administrative system the effects of which depend upon the content of rules and precedents only as they are applied by judges and juries in courts and by lawyers advising their clients.  And that fact means that courts will often bring their own administrative judgment to bear, sometimes applying rules of *per se* unlawfulness to business practices even when those practices sometimes produce benefits.  See, *e.g.*, F.M. Scherer & D. Ross, Industrial Market Structure and Economic Performance 335–339 (3d ed. 1990) (hereinafter Scherer & Ross) (describing some circumstances under which price-fixing agreements could be more beneficial than "unfettered competition," but also noting potential costs of moving from a *per se* ban to a rule of reasonableness assessment of such agreements).

I have already described studies and analyses that suggest (though they cannot prove) that resale price maintenance can cause harms with some regularity—and certainly when dealers are the driving force.  But what about benefits?  How often, for example, will the benefits to which the Court points occur in practice?  I can find no economic consensus on this point.  There is a consensus in the literature that "free riding" takes place.  But "free riding" often takes place in the economy without any legal effort to stop it.  Many visitors to California take free rides

on the Pacific Coast Highway. We all benefit freely from ideas, such as that of creating the first supermarket. Dealers often take a "free ride" on investments that others have made in building a product's name and reputation. The question is how often the "free riding" problem is serious enough significantly to deter dealer investment.

To be more specific, one can easily *imagine* a dealer who refuses to provide important presale services, say a detailed explanation of how a product works (or who fails to provide a proper atmosphere in which to sell expensive perfume or alligator billfolds), lest customers use that "free" service (or enjoy the psychological benefit arising when a high-priced retailer stocks a particular brand of billfold or handbag) and then buy from another dealer at a lower price. Sometimes this must happen in reality. But does it happen often? We do, after all, live in an economy where firms, despite *Dr. Miles' per se* rule, still sell complex technical equipment (as well as expensive perfume and alligator billfolds) to consumers.

All this is to say that the ultimate question is not whether, but *how much,* "free riding" of this sort takes place. And, after reading the briefs, I must answer that question with an uncertain "sometimes." See, *e.g.*, Brief for William S. Comanor and Frederic M. Scherer as *Amici Curiae* 6–7 (noting "skepticism in the economic literature about how often [free riding] actually occurs"); Scherer & Ross 551–555 (explaining the "severe limitations" of the free-rider justification for resale price maintenance); Pitofsky, Why *Dr. Miles* Was Right, 8 Regulation, No. 1, pp. 27, 29–30 (Jan./Feb. 1984) (similar analysis).

How easily can courts identify instances in which the benefits are likely to outweigh potential harms? My own answer is, *not very easily*. For one thing, it is often difficult to identify *who*—producer or dealer—is the moving force behind any given resale price maintenance agreement. Suppose, for example, several large multibrand

retailers all sell resale-price-maintained products. Suppose further that small producers set retail prices because they fear that, otherwise, the large retailers will favor (say, by allocating better shelf-space) the goods of other producers who practice resale price maintenance. Who "initiated" this practice, the retailers hoping for considerable insulation from retail competition, or the producers, who simply seek to deal best with the circumstances they find? For another thing, as I just said, it is difficult to determine just when, and where, the "free riding" problem is serious enough to warrant legal protection.

I recognize that scholars have sought to develop check lists and sets of questions that will help courts separate instances where anticompetitive harms are more likely from instances where only benefits are likely to be found. See, *e.g.*, 8 Areeda & Hovenkamp ¶¶1633c–1633e, at 330–339. See also Brief for William S. Comanor and Frederic M. Scherer as *Amici Curiae* 8–10. But applying these criteria in court is often easier said than done. The Court's invitation to consider the existence of "market power," for example, *ante*, at 18, invites lengthy time-consuming argument among competing experts, as they seek to apply abstract, highly technical, criteria to often ill-defined markets. And resale price maintenance cases, unlike a major merger or monopoly case, are likely to prove numerous and involve only private parties. One cannot fairly expect judges and juries in such cases to apply complex economic criteria without making a considerable number of mistakes, which themselves may impose serious costs. See, *e.g.*, H. Hovenkamp, The Antitrust Enterprise 105 (2005) (litigating a rule of reason case is "one of the most costly procedures in antitrust practice"). See also Bok, Section 7 of the Clayton Act and the Merging of Law and Economics, 74 Harv. L. Rev. 226, 238–247 (1960) (describing lengthy FTC efforts to apply complex criteria in a merger case).

Are there special advantages to a bright-line rule? Without such a rule, it is often unfair, and consequently impractical, for enforcement officials to bring criminal proceedings. And since enforcement resources are limited, that loss may tempt some producers or dealers to enter into agreements that are, on balance, anticompetitive.

Given the uncertainties that surround key items in the overall balance sheet, particularly in respect to the "administrative" questions, I can concede to the majority that the problem is difficult. And, if forced to decide now, at most I might agree that the *per se* rule should be slightly modified to allow an exception for the more easily identifiable and temporary condition of "new entry." See Pitofsky 1495. But I am not now forced to decide this question. The question before us is not what should be the rule, starting from scratch. We here must decide whether to change a clear and simple price-related antitrust rule that the courts have applied for nearly a century.

## II

We write, not on a blank slate, but on a slate that begins with *Dr. Miles* and goes on to list a century's worth of similar cases, massive amounts of advice that lawyers have provided their clients, and untold numbers of business decisions those clients have taken in reliance upon that advice. See, *e.g.*, *United States* v. *Bausch & Lomb Optical Co.*, 321 U. S. 707, 721 (1944); *Sylvania*, 433 U. S., at 51, n. 18 ("The *per se* illegality of [vertical] price restrictions has been established firmly for many years . . ."). Indeed a Westlaw search shows that *Dr. Miles* itself has been cited dozens of times in this Court and hundreds of times in lower courts. Those who wish this Court to change so well-established a legal precedent bear a heavy burden of proof. See *Illinois Brick Co.* v. *Illinois*, 431 U. S. 720, 736 (1977) (noting, in declining to overrule an earlier case interpreting §4 of the Clayton Act, that "considera-

tions of *stare decisis* weigh heavily in the area of statutory
construction, where Congress is free to change this Court's
interpretation of its legislation"). I am not aware of any
case in which this Court has overturned so well-
established a statutory precedent. Regardless, I do not see
how the Court can claim that ordinary criteria for over-
ruling an earlier case have been met. See, *e.g.*, *Planned
Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833,
854–855 (1992). See also *Federal Election Comm'n* v.
*Wisconsin Right to Life, Inc., ante*, at 19–21 (SCALIA, J.,
concurring in part and concurring in judgment).

## A

I can find no change in circumstances in the past several
decades that helps the majority's position. In fact, there
has been one important change that argues strongly to the
contrary. In 1975, Congress repealed the McGuire and
Miller-Tydings Acts. See Consumer Goods Pricing Act of
1975, 89 Stat. 801. And it thereby consciously *extended
Dr. Miles*' *per se* rule. Indeed, at that time the Depart-
ment of Justice and the FTC, then urging application of
the *per se* rule, discussed virtually every argument pre-
sented now to this Court as well as others not here pre-
sented. And they explained to Congress why Congress
should reject them. See Hearings on S. 408, at 176–177
(statement of Thomas E. Kauper, Assistant Attorney
General, Antitrust Division); *id.*, at 170–172 (testimony of
Lewis A. Engman, Chairman of the FTC); Hearings on
H. R. 2384, at 113–114 (testimony of Keith I. Clearwaters,
Deputy Assistant Attorney General, Antitrust Division).
Congress fully understood, and consequently intended,
that the result of its repeal of McGuire and Miller-Tydings
would be to make minimum resale price maintenance *per
se* unlawful. See, *e.g.*, S. Rep. No. 94–466, pp. 1–3 (1975)
("Without [the exemptions authorized by the Miller-
Tydings and McGuire Acts,] the agreements they author-

ize would violate the antitrust laws. . . . [R]epeal of the fair trade laws generally will prohibit manufacturers from enforcing resale prices"). See also *Sylvania, supra*, at 51, n. 18 ("Congress recently has expressed its approval of a *per se* analysis of vertical price restrictions by repealing those provisions of the Miller-Tydings and McGuire Acts allowing fair-trade pricing at the option of the individual States").

Congress did not prohibit this Court from reconsidering the *per se* rule. But enacting major legislation premised upon the existence of that rule constitutes important public reliance upon that rule. And doing so aware of the relevant arguments constitutes even stronger reliance upon the Court's keeping the rule, at least in the absence of some significant change in respect to those arguments.

Have there been any such changes? There have been a few economic studies, described in some of the briefs, that argue, contrary to the testimony of the Justice Department and FTC to Congress in 1975, that resale price maintenance is not harmful. One study, relying on an analysis of litigated resale price maintenance cases from 1975 to 1982, concludes that resale price maintenance does not ordinarily involve producer or dealer collusion. See Ippolito, Resale Price Maintenance: Empirical Evidence from Litigation, 34 J. Law & Econ. 263, 281–282, 292 (1991). But this study equates the failure of plaintiffs to *allege* collusion with the *absence* of collusion—an equation that overlooks the superfluous nature of allegations of horizontal collusion in a resale price maintenance case and the tacit form that such collusion might take. See H. Hovenkamp, Federal Antitrust Policy §11.3c, p. 464, n. 19 (3d ed. 2005); *supra*, at 4–5.

The other study provides a theoretical basis for concluding that resale price maintenance "need not lead to higher retail prices." Marvel & McCafferty, The Political Economy of Resale Price Maintenance, 94 J. Pol. Econ. 1074,

1075 (1986). But this study develops a theoretical model "under the assumption that [resale price maintenance] is efficiency-enhancing." *Ibid.* Its only empirical support is a 1940 study that the authors acknowledge is much criticized. See *id.*, at 1091. And many other economists take a different view. See Brief for William S. Comanor and Frederic M. Scherer as *Amici Curiae* 4.

Regardless, taken together, these studies at most may offer some mild support for the majority's position. But they cannot constitute a major change in circumstances.

Petitioner and some *amici* have also presented us with newer studies that show that resale price maintenance sometimes brings consumer benefits. Overstreet 119–129 (describing numerous case studies). But the proponents of a *per se* rule have always conceded as much. What is remarkable about the majority's arguments is that *nothing* in this respect *is new*. See *supra*, at 3, 12 (citing articles and congressional testimony going back several decades). The only new feature of these arguments lies in the fact that the most current advocates of overruling *Dr. Miles* have abandoned a host of other not-very-persuasive arguments upon which prior resale price maintenance proponents used to rely. See, *e.g.*, 8 Areeda ¶1631a, at 350–352 (listing "'[t]raditional' justifications" for resale price maintenance).

The one arguable exception consists of the majority's claim that "even absent free riding," resale price maintenance "may be the most efficient way to expand the manufacturer's market share by inducing the retailer's performance and allowing it to use its own initiative and experience in providing valuable services." *Ante*, at 12. I cannot count this as an exception, however, because I do not understand how, in the absence of free-riding (and assuming competitiveness), an established producer would need resale price maintenance. Why, on these assumptions, would a dealer not "expand" its "market share" as

best that dealer sees fit, obtaining appropriate payment from consumers in the process? There may be an answer to this question. But I have not seen it. And I do not think that we should place significant weight upon justifications that the parties do not explain with sufficient clarity for a generalist judge to understand.

No one claims that the American economy has changed in ways that might support the majority. Concentration in retailing has increased. See, *e.g.*, Brief for Respondent 18 (since minimum resale price maintenance was banned nationwide in 1975, the total number of retailers has dropped while the growth in sales per store has risen); Brief for American Antitrust Institute as *Amicus Curiae* 17, n. 20 (citing private study reporting that the combined sales of the 10 largest retailers worldwide has grown to nearly 30% of total retail sales of top 250 retailers; also quoting 1999 Organisation for Economic Co-operation and Development report stating that the "'last twenty years have seen momentous changes in retail distribution including significant increases in concentration'"); Mamen, Facing Goliath: Challenging the Impacts of Supermarket Consolidation on our Local Economies, Communities, and Food Security, The Oakland Institute, 1 Policy Brief, No. 3, pp. 1, 2 (Spring 2007), http://www.oaklandinstitute.org/pdfs/facing_goliath.pdf (as visited June 25, 2007, and available in Clerks of Court's case file) (noting that "[f]or many decades, the top five food retail firms in the U. S. controlled less than 20 percent of the market"; from 1997 to 2000, "the top five firms increased their market share from 24 to 42 percent of all retail sales"; and "[b]y 2003, they controlled over half of all grocery sales"). That change, other things being equal, may enable (and motivate) more retailers, accounting for a greater percentage of total retail sales volume, to seek resale price maintenance, thereby making it more difficult for price-cutting competitors (perhaps internet retailers) to obtain market share.

Nor has anyone argued that concentration among manufacturers that might use resale price maintenance has diminished significantly. And as far as I can tell, it has not. Consider household electrical appliances, which a study from the late 1950's suggests constituted a significant portion of those products subject to resale price maintenance at that time. See Hollander, United States of America, in Resale Price Maintenance 67, 80–81 (B. Yamey ed. 1966). Although it is somewhat difficult to compare census data from 2002 with that from several decades ago (because of changes in the classification system), it is clear that at least some subsets of the household electrical appliance industry are *more* concentrated, in terms of manufacturer market power, now than they were then. For instance, the top eight domestic manufacturers of household cooking appliances accounted for 68% of the domestic market (measured by value of shipments) in 1963 (the earliest date for which I was able to find data), compared with 77% in 2002. See Dept. of Commerce, Bureau of Census, 1972 Census of Manufacturers, Special Report Series, Concentration Ratios in Manufacturing, No. MC72(SR)–2, p. SR2–38 (1975) (hereinafter 1972 Census); Dept. of Commerce, Bureau of Census, 2002 Economic Census, Concentration Ratios: 2002, No. EC02–31SR–1, p. 55 (2006) (hereinafter 2002 Census). The top eight domestic manufacturers of household laundry equipment accounted for 95% of the domestic market in 1963 (90% in 1958), compared with 99% in 2002. 1972 Census, at SR2–38; 2002 Census, at 55. And the top eight domestic manufacturers of household refrigerators and freezers accounted for 91% of the domestic market in 1963, compared with 95% in 2002. 1972 Census, at SR2–38; 2002 Census, at 55. Increased concentration among manufacturers increases the likelihood that producer-originated resale price maintenance will prove more prevalent today than in years past, and more harmful. At the very least, the

majority has not explained how these, or other changes in the economy could help support its position.

In sum, there is no relevant change. And without some such change, there is no ground for abandoning a well-established antitrust rule.

B

With the preceding discussion in mind, I would consult the list of factors that our case law indicates are relevant when we consider overruling an earlier case. JUSTICE SCALIA, writing separately in another of our cases this Term, well summarizes that law. See *Wisconsin Right to Life, Inc., ante*, at 19–21. (opinion concurring in part and concurring in judgment). And every relevant factor he mentions argues against overruling *Dr. Miles* here.

First, the Court applies *stare decisis* more "rigidly" in statutory than in constitutional cases. See *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 543 (1962); *Illinois Brick Co.*, 431 U. S., at 736. This is a statutory case.

Second, the Court does sometimes overrule cases that it decided wrongly only a reasonably short time ago. As JUSTICE SCALIA put it, "[o]verruling a *constitutional* case decided just a few years earlier is far from unprecedented." *Wisconsin Right to Life, ante*, at 19 (emphasis added). We here overrule one *statutory* case, *Dr. Miles*, decided 100 years ago, and we overrule the cases that reaffirmed its *per se* rule in the intervening years. See, *e.g.*, *Trenton Potteries*, 273 U. S., at 399–401; *Bausch & Lomb*, 321 U. S., at 721; *United States* v. *Parke, Davis & Co.*, 362 U. S. 29, 45–47 (1960); *Simpson* v. *Union Oil Co. of Cal.*, 377 U. S. 13, 16–17 (1964).

Third, the fact that a decision creates an "unworkable" legal regime argues in favor of overruling. See *Payne* v. *Tennessee*, 501 U. S. 808, 827–828 (1991); *Swift & Co.* v. *Wickham*, 382 U. S. 111, 116 (1965). Implementation of the *per se* rule, even with the complications attendant the

exception allowed for in *United States* v. *Colgate & Co.*,
250 U. S. 300 (1919), has proved practical over the course
of the last century, particularly when compared with the
many complexities of litigating a case under the "rule of
reason" regime.  No one has shown how moving from the
*Dr. Miles* regime to "rule of reason" analysis would make
the legal regime governing minimum resale price mainte-
nance more "administrable," *Wisconsin Right to Life, ante*,
at 20 (opinion of SCALIA, J.), particularly since *Colgate*
would remain good law with respect to *unreasonable* price
maintenance.

Fourth, the fact that a decision "unsettles" the law may
argue in favor of overruling.  See *Sylvania*, 433 U. S., at
47; *Wisconsin Right to Life, ante*, at 20–21 (opinion of
SCALIA, J.).  The *per se* rule is well-settled law, as the
Court itself has previously recognized.  *Sylvania, supra*, at
51, n. 18.  It is the majority's change here that will unset-
tle the law.

Fifth, the fact that a case involves property rights or
contract rights, where reliance interests are involved,
argues against overruling.  *Payne, supra*, at 828.  This
case involves contract rights and perhaps property rights
(consider shopping malls).  And there has been consider-
able reliance upon the *per se* rule.  As I have said, Con-
gress relied upon the continued vitality of *Dr. Miles* when
it repealed Miller-Tydings and McGuire.  *Supra*, at 12–13.
The Executive Branch argued for repeal on the assump-
tion that *Dr. Miles* stated the law.  *Ibid.*  Moreover, whole
sectors of the economy have come to rely upon the *per se*
rule.  A factory outlet store tells us that the rule "form[s]
an essential part of the regulatory background against
which [that firm] and many other discount retailers have
financed, structured, and operated their businesses."
Brief for Burlington Coat Factory Warehouse Corp. as
*Amicus Curiae* 5.  The Consumer Federation of America
tells us that large low-price retailers would not exist with-

out *Dr. Miles*; minimum resale price maintenance, "by stabilizing price levels and preventing low-price competition, erects a potentially insurmountable barrier to entry for such low-price innovators." Brief for Consumer Federation of America as *Amicus Curiae* 5, 7–9 (discussing, *inter alia*, comments by Wal-Mart's founder 25 years ago that relaxation of the *per se* ban on minimum resale price maintenance would be a "'great danger'" to Wal-Mart's then-relatively-nascent business). See also Brief for American Antitrust Institute as *Amicus Curiae* 14–15, and sources cited therein (making the same point). New distributors, including internet distributors, have similarly invested time, money, and labor in an effort to bring yet lower cost goods to Americans.

This Court's overruling of the *per se* rule jeopardizes this reliance, and more. What about malls built on the assumption that a discount distributor will remain an anchor tenant? What about home buyers who have taken a home's distance from such a mall into account? What about Americans, producers, distributors, and consumers, who have understandably assumed, at least for the last 30 years, that price competition is a legally guaranteed way of life? The majority denies none of this. It simply says that these "reliance interests . . . , like the reliance interests in *Khan*, cannot justify an inefficient rule." *Ante*, at 27.

The Court minimizes the importance of this reliance, adding that it "is also of note" that at the time resale price maintenance contracts were lawful "'no more than a tiny fraction of manufacturers ever employed'" the practice. *Ibid.* (quoting Overstreet 6). By "tiny" the Court means manufacturers that accounted for up to "'ten percent of consumer goods purchases'" annually. *Ibid.*. That figure in today's economy equals just over $300 billion. See Dept. of Commerce, Bureau of Census, Statistical Abstract of the United States: 2007, p. 649 (126th ed.) (over $3

trillion in U. S. retail sales in 2002).  Putting the Court's
estimate together with the Justice Department's early
1970's study translates a legal regime that permits all
resale price maintenance into retail bills that are higher
by an average of roughly $750 to $1000 annually for an
American family of four.  Just how much higher retail bills
will be after the Court's decision today, of course, depends
upon what is now unknown, namely how courts will decide
future cases under a "rule of reason."  But these figures
indicate that the amounts involved are important to
American families and cannot be dismissed as "tiny."

Sixth, the fact that a rule of law has become "embedded"
in our "national culture" argues strongly against overrul-
ing.  *Dickerson* v. *United States*, 530 U. S. 428, 443–444
(2000).  The *per se* rule forbidding minimum resale price
maintenance agreements has long been "embedded" in the
law of antitrust.  It involves price, the economy's "'central
nervous system.'"  *National Soc. of Professional Engineers*,
435 U. S., at 692 (quoting *Socony-Vacuum Oil*, 310 U. S.,
at 226, n. 59).  It reflects a basic antitrust assumption
(that consumers often prefer lower prices to more service).
It embodies a basic antitrust objective (providing consum-
ers with a free choice about such matters).  And it creates
an easily administered and enforceable bright line, "Do
not agree about price," that businesses as well as lawyers
have long understood.

The only contrary *stare decisis* factor that the majority
mentions consists of its claim that this Court has "[f]rom
the beginning . . . treated the Sherman Act as a common-
law statute," and has previously overruled antitrust prece-
dent.  *Ante*, at 20, 21–22.  It points in support to *State Oil
Co.* v. *Khan*, 522 U. S. 3 (1997), overruling *Albrecht* v.
*Herald Co.*, 390 U. S. 145 (1968), in which this Court had
held that *maximum* resale price agreements were unlaw-
ful *per se*, and to *Sylvania*, overruling *United States* v.
*Arnold, Schwinn & Co.*, 388 U. S. 365 (1967), in which this

Court had held that producer-imposed territorial limits were unlawful *per se*.

The Court decided *Khan,* however, 29 years after *Albrecht*—still a significant period, but nowhere close to the century *Dr. Miles* has stood. The Court specifically noted the *lack* of any significant reliance upon *Albrecht*. 522 U. S., at 18–19 (*Albrecht* has had "little or no relevance to ongoing enforcement of the Sherman Act"). *Albrecht* had far less support in traditional antitrust principles than did *Dr. Miles*. Compare, *e.g.*, 8 Areeda & Hovenkamp ¶1632, at 316–328 (analyzing potential harms of minimum resale price maintenance), with *id.,* ¶1637, at 352–361 (analyzing potential harms of maximum resale price maintenance). See also, *e.g.*, Pitofsky 1490, n. 17. And Congress had nowhere expressed support for *Albrecht'*s rule. *Khan, supra,* at 19.

In *Sylvania*, the Court, in overruling *Schwinn*, explicitly distinguished *Dr. Miles* on the ground that while Congress had "recently . . . expressed its approval of a *per se* analysis of vertical price restrictions" by repealing the Miller-Tydings and McGuire Acts, "[n]o similar expression of congressional intent exists for nonprice restrictions." 433 U. S., at 51, n. 18. Moreover, the Court decided *Sylvania* only a decade after *Schwinn*. And it based its overruling on a generally perceived need to avoid "confusion" in the law, 433 U. S., at 47–49, a factor totally absent here.

The Court suggests that it is following "the common-law tradition." *Ante* at 26. But the common law would not have permitted overruling *Dr. Miles* in these circumstances. Common-law courts rarely overruled well-established earlier rules outright. Rather, they would over time issue decisions that gradually eroded the scope and effect of the rule in question, which might eventually lead the courts to put the rule to rest. One can argue that modifying the *per se* rule to make an exception, say, for new entry, see Pitofsky 1495, could prove consistent with

this approach. To swallow up a century-old precedent, potentially affecting many billions of dollars of sales, is not. The reader should compare today's "common-law" decision with Justice Cardozo's decision in *Allegheny College* v. *National Chautauqua Cty. Bank of Jamestown*, 246 N. Y. 369, 159 N. E. 173 (1927), and note a gradualism that does not characterize today's decision.

Moreover, a Court that rests its decision upon economists' views of the economic merits should also take account of legal scholars' views about common-law overruling. Professors Hart and Sacks list 12 factors (similar to those I have mentioned) that support judicial "adherence to prior holdings." They all support adherence to *Dr. Miles* here. See H. Hart & A. Sacks, The Legal Process 568–569 (W. Eskridge & P. Frickey eds. 1994). Karl Llewellyn has written that the common-law judge's "conscious reshaping" of prior law "must so move as to hold the degree of movement down to the degree to which need truly presses." The Bramble Bush 156 (1960). Where here is the pressing need? The Court notes that the FTC argues here in favor of a rule of reason. See *ante*, at 20–21. But both Congress and the FTC, unlike courts, are well-equipped to gather empirical evidence outside the context of a single case. As neither has done so, we cannot conclude with confidence that the gains from eliminating the *per se* rule will outweigh the costs.

In sum, every *stare decisis* concern this Court has ever mentioned counsels against overruling here. It is difficult for me to understand how one can believe both that (1) satisfying a set of *stare decisis* concerns justifies overruling a recent constitutional decision, *Wisconsin Right to Life, Inc., ante*, at 19–21 (SCALIA, J., joined by KENNEDY and THOMAS, JJ., concurring in part and concurring in judgment), but (2) failing to satisfy any of those same concerns nonetheless permits overruling a longstanding statutory decision. Either those concerns are relevant or

BREYER, J., dissenting

they are not.

\*    \*    \*

The only safe predictions to make about today's decision are that it will likely raise the price of goods at retail and that it will create considerable legal turbulence as lower courts seek to develop workable principles.  I do not believe that the majority has shown new or changed conditions sufficient to warrant overruling a decision of such long standing.  All ordinary *stare decisis* considerations indicate the contrary.  For these reasons, with respect, I dissent.